FILED - USDC -NH
2026 NOV 17 AM8:58

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW HAMPSHIRE

DEXTER WILLIAM DOW,
Plaintiff, pro se,
v. Civil Action No. ___________________
TOWN OF NORTHFIELD, NEW HAMPSHIRE;
ALLYSIA L. BURTON, individually and in her official capacity as a Northfield police officer (Sergeant in 2023–2024, now Lieutenant);
JESSE COLBY, individually and in his official capacity as Chief of Police of Northfield (2023–2024);
MARK LEWANDOSKI, in his official capacity as Interim Chief of Police of Northfield;
RYAN SMITH, MICHAEL FITZHERBERT, and RICHARD PAULHUS, individually and in their official capacities as Northfield police officers;
ROBERT L. QUINN, in his official capacity as Commissioner of the New Hampshire Department of Safety;
MARK B. HALL, in his official capacity as Colonel and Director of the New Hampshire Division of State Police;
MARY G. BONILLA, in her official capacity as an officer of the New Hampshire State Police Permits and Licensing Unit; and
UNITED STATES OF AMERICA (Counts IX and X only),
Defendants.

## COMPLAINT AND DEMAND FOR JURY TRIAL

## I. INTRODUCTION

1. This is a civil rights action under 42 U.S.C. § 1983, 18 U.S.C. § 925A, 28 U.S.C. §§ 2201–2202, and New Hampshire law. In November 2023, Plaintiff Dexter William Dow walked into the Northfield Police Department to report that his daughter and mother were missing. He left without his lawfully owned firearm. No crime was charged. No warrant issued. No court, statute, or emergency authorized the taking, and the incident file the Department itself created is classified "No Crime Involved." (Ex. B, D.)

2. The seizing officer, then-Sergeant Allysia L. Burton, wrote in the Department's own log that the firearm "was seized for severe mental health issues" and that Dow would need an evaluation "and motion from court to get the firearm back." (Ex. B.) Ordered twice by a court to state the legal authority for the seizure, the Department stated none: it filed no memorandum, produced no record check, and did not appear at the hearing set for that purpose. (Ex. F, G.) To this day, no legal authority for the seizure has ever been identified

by anyone. (The Department's calls-for-service entries for the seizure span November 11–12, 2023; property item 23-79-PR.)

3. To keep the firearm, Northfield's records and its officer's sworn word supplied what the law did not. The Department's dispatch record converted Dow's primary care provider, Abigail Olden, APRN, into his "THERAPIST" (Ex. E); Burton then testified that a "therapist" had reported "a diagnosis of Schizophrenia" and that Dow "was off his medications" (Ex. F). No such diagnosis exists. No such therapist exists. The provider herself told the same court, in writing, that Dow had been attending medication and wellness follow-ups with her for four months and "was currently stable and doing well." (Ex. F.) Burton solicited mental-health-flagged records about Dow from another town by informal email, mid-litigation, telling that agency she "has court with him on the 7th." (Ex. J.)

4. On August 6, 2026, the Meredith Police Department produced the transmission itself: Lt. Philip McLaughlin's email to Sgt. Burton of February 29, 2024, 6:39 a.m., and her reply, "Thank you, Lieutenant!", at 11:28 a.m. The lieutenant's cover note states that most of Plaintiff's master record was "not relevant," consisting of "custody issues with his ex," and that he had included "one call from a while ago and more recent information": an eleven-year-old 2015 well-being check, outside any requested time frame by Meredith's own account, and the unredacted November 2023 report recording that Plaintiff posed no danger. The transmitted records reached the personal work mailbox of the officer litigating against Plaintiff six days before the scheduled hearing. As of the Town's July 28, 2026 declaration that its production was complete, Northfield had produced neither message. (Ex. W.) The nine-page packet itself — print-dated February 28–29, 2024 and carrying the caution header, the 2006 entries without annulment marking, the 2015 well-being check, and Incident 23-368-OF unredacted — was produced by Meredith on August 17, 2026. (Ex. X.)

5. And before Plaintiff ever reached the station on November 11, Burton had already reported him to the State's child-protection agency, in her own recorded words: "I informed them that I felt that Dexter, and possibly his mother, were having psychotic episodes. I told them that I was informed by Meredith Police that he is carrying a firearm, although I have never met him." Her stated concern: that "he would do something to her," meaning his daughter. (Ex. C at 1; Ex. V.) A police officer rendered psychiatric conclusions on two people and named an armed stranger a danger to his own child, in a report to DCYF, about a man she admitted she had never met, hours after the welfare check she herself ordered found that child "happy and in good health."

6. On June 24, 2024, after the Department withdrew its objection and its counsel represented that background checks disclosed no disqualifiers, the court ordered the firearms returned, and they were. (Ex. H.) Sixty-eight days after that representation, the New Hampshire State Police issued an Order of Denial blocking Dow's purchase of a handgun. The Order

states that Dow's "criminal record has the following conviction(s)" and lists exactly one: a federal NICS entry coded 922(g)(3), "controlled substance illegal user/addict," with an "offense date" of August 8, 2024, the date of the purchase application itself, a "court" that is a database, and a "docket" that is a transaction number. (Ex. A.) Dow has no such conviction. No such conviction exists.

7. That sequence did more than insult the record. It put Dow in criminal jeopardy. The State's officers handed him firearms under court order while the State's systems simultaneously branded him a prohibited person; if the 922(g)(3) designation were true, Dow's court-ordered possession would itself expose him to federal felony prosecution carrying up to fifteen years' imprisonment. 18 U.S.C. §§ 922(g), 924(a)(8). The designation is false, but only the Defendants can say so in the systems that matter, and they have not. Every day it stands, Dow must choose between exercising a constitutional right the courts restored to him and trusting records his own government has already falsified once. Plaintiff is a domestic abuse survivor. The Defendants' own files identify him as the protected party in a domestic violence order against Megan Robinson and as the target of her documented, years-long pattern of violations, impersonations, and false accusations, a pattern their own investigators discredited. (Ex. P, Q, R.) To take a survivor of years of false allegations and subject him, this time by government hands, to a false psychiatric label, a false drug record, a child-protection report authored by a stranger, and a fabricated conviction was not merely unlawful. It was manipulative of everything his history had taught him to fear, and it reopened every one of those wounds. That is pleaded here as fact and as damages.

8. The only record-level foundation anywhere in the multi-agency file for a "user/addict" designation is a single disputed line in Northfield's incident narrative attributing to Dow a statement that he "smokes marijuana." (Ex. C.) Even taken as true, that profile cannot constitutionally support disarmament. United States v. Hemani, No. 24-1234, 608 U.S. ___, slip op. at 10–11, 17–19 (June 18, 2026). Dow brings this action for damages, for correction and expungement of the false federal record, for a declaration of his lawful status, and to end a continuing course of concealment that three other agencies' files have already exposed.

## II. JURISDICTION, VENUE, AND TIMELINESS

9. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 over the claims arising under the United States Constitution, 42 U.S.C. § 1983, and 18 U.S.C. § 925A; under 28 U.S.C. §§ 2201–2202 for declaratory relief; and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367, which arise from the same operative facts.

10. Venue is proper under 28 U.S.C. § 1391(b): all Defendants reside or perform official functions in New Hampshire and the events occurred in Merrimack and Belknap Counties.

11. This action is timely as to each claim on that claim's own accrual date. Section 1983 borrows New Hampshire's three-year limitations period, RSA 508:4, I, and federal law fixes accrual at knowledge of the injury. Gorelik v. Costin, 605 F.3d 118, 121–22 (1st Cir. 2010). The claims arising from the February 28–29, 2024 solicitation, transmission, and use of records; the April 2024 conduct surrounding the state proceedings; the August 8, 2024 denial and the August 31, 2024 Order of Denial (Counts IX and X); the 2024 publications; and the 2026 records conduct (Counts XVII and XVIII) each accrued within three years of filing.

12. As to conduct of November 2023, Plaintiff pleads in the alternative: (a) under RSA 508:4, I's own terms, the fabrication, circulation, and concealment of the records — including the February 29, 2024 transmission, its curation, and the record-level source of the federal entry — were not discovered and could not reasonably have been discovered until the June–August 2026 productions, and those claims run from that discovery; (b) the retention of the firearm was a continuing seizure through its return following the June 24, 2024 order; (c) Defendants' concealment — including the Town's July 28, 2026 written declaration that production was "fully satisfied" while the transmission sat unproduced in its own systems — equitably tolls any period that would otherwise have run. The November 2023 acts are in any event pleaded as the origin of one continuing course of conduct.

## III. PARTIES

13. Plaintiff Dexter William Dow is an adult resident of Franklin, Merrimack County, New Hampshire, who until recently resided in Northfield, New Hampshire, and the founder and editor of the Granite State Report, an independent civic journalism publication whose value rests on his credibility. He sues pro se.

14. Defendant Town of Northfield is a New Hampshire municipality operating the Northfield Police Department ("NPD") and responsible for its policies, customs, training, supervision, and records. The Northfield Police Department is not a suable entity separate from the Town, Green v. Concord Police, 2000 DNH 236 (D.N.H. Nov. 1, 2000), and is referred to herein descriptively.

15. Defendant Allysia L. Burton was a Sergeant of the NPD at all times in 2023–2024; NPD records printed in 2026 identify her as a Lieutenant. (Ex. D.) She personally seized Plaintiff's firearm, authored the seizure entries and narrative, initiated the inter-agency and DCYF contacts described below, solicited Plaintiff's mental-health-flagged records from another agency, and gave the testimony described below. She is sued individually and in her official capacity.

16. Defendant Jesse Colby was Chief of Police of Northfield in 2023–2024 and the approving authority on the seizure report. (Ex. D.) On information and belief he was the Town's final

policymaker for law enforcement operations. He is sued individually and in his official capacity.

17. Defendant Mark Lewandoski is the Interim Chief of Police, sued in his official capacity for prospective relief, including record correction and production.

18. Defendants Ryan Smith, Michael Fitzherbert, and Richard Paulhus were NPD officers. Smith participated in the November 11, 2023 encounter and authored the contemporaneous log entries, including the disputed "marijuana user" entry. (Ex. B, D.) Fitzherbert created the record designating Olden, an APRN, as Plaintiff's "THERAPIST." (Ex. E.) Paulhus took the November 5, 2023 call and logged the inter-agency relays. (Ex. E.) Each is sued individually and in his official capacity.

19. Defendant Robert L. Quinn is Commissioner of the New Hampshire Department of Safety; Defendant Mark B. Hall is Colonel and Director of the Division of State Police, the state NICS point of contact; Defendant Mary G. Bonilla signed the Order of Denial for Colonel Hall. (Ex. A.) Each is sued in official capacity only, for correction, expungement, approval of the denied transfer, and prospective relief under 18 U.S.C. § 925A, 28 U.S.C. § 2201, and the Fourteenth Amendment. See Ex parte Young, 209 U.S. 123 (1908).

20. Defendant United States of America is named under 18 U.S.C. § 925A and 28 U.S.C. § 2201 only, because the denying record's stated source is "FBI NICS" and complete relief requires correction of the federal indices.

21. Nonparty actors referenced herein: Abigail Olden, APRN (primary care provider); Meredith PD Officer Ryan Gilcoine (a patrol officer in November 2023; a 2026 reprint styles him "Cpl."), Sgt. William Goulet, Lt. Philip McLaughlin, Chief Michael Harper, Admin. Asst. Tonia True; Franklin PD personnel, including dispatcher Katherine Burton (no relation to Defendant Burton; no wrongdoing alleged); DCYF intake officer with surname Keeley (call no. 1050008); Asst. Merrimack County Attorney Cristina E. Brooks; Northfield Town Administrator Stephanie Giovannucci; NPD administrator Terri Glines; and Megan A. Robinson (deceased 2021). Plaintiff's minor child is referred to only as D.D.

## IV. STATEMENT OF FACTS

### A. 2019–2021: Plaintiff is the documented victim of a pattern of false reports, and the pattern is in the Defendants' own files

22. In 2019 Plaintiff held a Final Domestic Violence Order of Protection against Megan Robinson, the mother of D.D. On May 28, 2019, Franklin police obtained an arrest warrant against Robinson on two counts of violating that order under RSA 173-B:9; the arrest file identifies Plaintiff as the victim. (Ex. R.) That April, a Franklin log records Robinson telephoning D.D.'s daycare while falsely claiming to be "Julie from DCYF"; the daycare traced the number to Robinson. (Ex. R.) A 2019 Northfield report likewise

documents Robinson's claim that Plaintiff "had stolen her medications." (Ex. P.) Plaintiff withdrew the protective order on September 18, 2019.

23. In October 2021 Robinson told Meredith police Plaintiff had stolen her Adderall. The detective's report names Plaintiff as "suspect" but documents that Robinson supplied no proof, that her own text exhibits did not support the claim, and that a Northfield day-shift lieutenant "very familiar with Robinson" had "no information on her being referred to Meredith PD." The matter was suspended without charge after Robinson's death; the New Hampshire State Police handled the death investigation. (Ex. Q.) Plaintiff has never been arrested for, charged with, or convicted of any drug offense. As early as 2021, then, Northfield's own institutional memory could not corroborate the accusations orbiting Plaintiff, and no agency ever substantiated one.

**B. November 5, 2023: two departments respond; neither finds grounds to act; Northfield's record invents a "therapist"**

24. On the morning of November 5, 2023, Abigail Olden, APRN, Plaintiff's primary care provider, called NPD to request a welfare check after Plaintiff texted her overnight with paranoid thoughts. NPD's call record, taken by Paulhus and entered by Fitzherbert, designates the caller as "THERAPIST OLDEN, ABBY" and its narrative begins "Therapist Abby Olden called." (Ex. E.) Olden is a licensed Advanced Practice Registered Nurse. She is not, and has never been, a therapist. The mislabel was created by NPD on November 5, 2023, was never corrected, and became the department's vocabulary for everything that followed.

25. Olden made the same request to Meredith, where Plaintiff's father lives. Meredith officers located Plaintiff, interviewed him and his father, and documented that he "refused all medical attention," made no threats, and "appeared to be in good health." Plaintiff had voluntarily handed his pistol to his father on arrival; Meredith returned it before he left, running serial BCXY022 at 13:14. At about 2:55 p.m., a Meredith officer called Olden back and explained there was no basis for an involuntary emergency admission, inviting her to call again if anything changed. (Ex. L.) Meredith relayed all of it to NPD; Paulhus logged at 14:12 that Meredith "didn't IEA him" and that Plaintiff "does have a firearm." (Ex. E.) By the afternoon of November 5, NPD knew a neighboring department had evaluated Plaintiff face to face, found no danger, and armed him back.

26. The logs also preserve a characterization Plaintiff can now test against the messages themselves. NPD's record says the caller reported Plaintiff "texted her last night at 0200 with paranoid thoughts"; Meredith's says "he has been messaging her all weekend." The preserved thread shows a single overnight message, sent at 2:23 a.m. on November 5 in grief and fear, threatening no one, preceded in the thread only by routine scheduling correspondence, and answered by the provider at 5:22 a.m. with the question whether he could go to the emergency room. (Ex. U.) Whatever was said on the calls, the picture that

traveled through two departments' files, a man blanketing his provider with weekend messages, is contradicted by the record of the messages.

**C. November 8, 2023: Meredith holds and returns the pistol again, makes the DCYF intake report, and briefs Burton the same night**

27. On the evening of November 8, an anonymous caller who identified first as a "concerned neighbor," then as someone hearing events "over the phone," then as "a friend that is long distance," reported yelling at the father's Meredith home and said Plaintiff had a gun. (Meredith CFS 23-10332.) Meredith responded. Officer Gilcoine's narrative, approved by Lt. Philip McLaughlin, records that Sgt. Goulet removed the pistol from Plaintiff's waistband "for safety purposes" during the encounter and that "prior to leaving, Dexter asked for his firearm back and it was given to him," with the written finding that Plaintiff "has not made any statements to harm himself or others and has not demonstrated that he lacks the ability to care for himself." (Ex. K.)

28. Gilcoine then "contacted the DCYF intake line and reported" D.D.'s living situation to DCYF intake officer Keeley, who issued call number 1050008. (Ex. K.) The same night's log records: "Sgt Burton from Northfield PD calling, adv of info ref call from tonight and previous call." (Meredith CFS 23-10332.) By November 8, Burton personally knew of both encounters, both on-scene no-danger findings, both returns of the firearm, and the existing DCYF intake.

**D. November 11, 2023: the station-house seizure**

29. On November 11, Burton, on patrol, received an FBI tip-line relay of reports about the household attributed to Plaintiff's mother, and learned from Meredith that Plaintiff was carrying a firearm. (Ex. C at 1.) That evening she caused simultaneous welfare checks on D.D. through two other towns: Meredith's log at 18:09 records "SGT.BURTON from Northfield PD calling in to request a well being check to be done on DEXTER DOW's child," adding "SGT.BURTON also stated that they will be calling DCYF to notify them"; Franklin's log at 18:03 records "SGT BURTON NORTHFIELD PD REQ WELF CK ON CHILD." (Ex. L.3, M.) Meredith found D.D. at her grandfather's home "happy and in good health"; "everything was fine." (Ex. L.3.)

30. Then, still before the station visit, Burton "[call]ed DCYF to make a report," as her narrative states. What she told the intake line, in her own words: "I informed them that I felt that Dexter, and possibly his mother, were having psychotic episodes. I told them that I was informed by Meredith Police that he is carrying a firearm, although I have never met him. I told them that my concern was that if he is having delusions … he would do something to her." (Ex. C at 1; Ex. V.) Northfield's production contains no record of that report, that call, or any DCYF communication at all.

31. The same night's records also contain attributions Plaintiff flatly denies and the records themselves undercut. Franklin's CAD header for the check carries a calling-party

association with Plaintiff, on a call the very same record's narrative sources to "SGT BURTON NORTHFIELD PD" (Ex. M); Meredith's log attributes to Plaintiff and his mother repeated calls to the FBI hotline (Ex. L.3). Plaintiff has never called the FBI hotline and never placed any call to any police agency in these events. Every produced November 2023 call originates with Olden, the shifting-identity caller, family members, the FBI relay, or Burton herself, and Burton's own narrative sources the FBI reports to Barbara Williams alone (Ex. C at 1).

32. At 23:55 that night, Plaintiff went voluntarily to the Northfield station to report that his daughter and mother were missing. (Ex. D.) Smith's contemporaneous log states: "DEXTER SHOWED UP AT PD REPORTING HIS DAUGHTER AND MOTHER WERE KIDNAPPED. HE WAS ARMED WITH A FIREARM WHICH HE ALLOWED 604 TO TAKE FOR SAFE KEEPING. HE THEN ADMITTED TO BEING A MARIJUANA USER." (Ex. B.) Burton's narrative describes the taking in her own words: "I asked Dexter if he had a firearm on him. He said yes. He said, 'You can take it.' He turned his hip towards me and I removed the firearm. I brought the firearm in the police station to secure it." It continues: "I asked Dexter if he uses any drugs. He said he smokes marijuana but that's it." (Ex. C.) Plaintiff disputes that attribution. No field test, no search, no drugs, no charge, no impairment observation, and no medical or treatment record supports any characterization of Plaintiff as a drug user or addict, then or ever.

33. A momentary hand-over at a police counter, for safekeeping while a frightened father reported his family missing, became a confiscation. Plaintiff asked for the firearm back that night; it was refused. He declined a voluntary psychological evaluation, as was his right. (Ex. C at 2.) At 01:05–01:09 on November 12, Burton entered the department's official position: the firearm "was seized for severe mental health issues" and Plaintiff "will [need an] eval and motion from court to get the firearm back." (Ex. B.) No statute, warrant, order, or emergency admission supported the seizure or the announced conditions; the same night, DCYF called NPD to report a voluntary, non-binding safety plan under which D.D. stayed with her grandfather. (Ex. C.) The incident report, 23-238-OF, lists Burton reporting, Smith assisting, and Chief Jesse Colby approving, over the classification "No Crime Involved." (Ex. D.)

**E. February–June 2024: the Town objects on mental-health grounds, gathers medical records ex parte, gives false testimony, defies two orders, then concedes**

34. Plaintiff petitioned the 6th Circuit Court, District Division, Franklin, No. 437-2024-CV-00008, for return of his property. On February 26, 2024, the State, through Assistant County Attorney Brooks, objected and moved to continue, asserting "specific concerns regarding the plaintiff's mental health and recent calls," naming "Sgt. Allysia Burton" as its witness, captioning the civil matter "State of New Hampshire v. Dexter Dow," and calling Plaintiff's own motion "the Defendant's Motion." (Ex. I.) Plaintiff was the petitioner. He was a defendant in nothing. The filing also bears the wrong case number,

"24-CV-08"; the case was 437-2024-CV-00008. And it recites receipt on "Friday, February 26, 2024"; February 26, 2024 was a Monday. (Ex. I, details 1–2.)

35. Two days later, on February 28, 2024, Burton telephoned Meredith "to inquire if we can send her CFS that show mental health concerns involving DEXTER DOW," directed them to ABURTON@northfieldnh.gov, and "advised that she has court with him on the 7th." (Ex. J.) A police officer solicited another town's mental-health-flagged records about a civil litigant, by informal email, outside any warrant, subpoena, or records process, expressly for use at his hearing.

36. The timing was not incidental. On the same day, February 28, 2024, the court issued its Notice of Hearing directing the New Hampshire Department of Safety to search its records concerning Plaintiff and report in advance of the hearing. (No. 437-2024-CV-00008, Notice of Hearing, Feb. 28, 2024.) The Department of Safety so directed is the same department whose Permits and Licensing Unit issued the August 31, 2024 Order of Denial six months later.

37. At the April 2, 2024 evidentiary hearing, Burton testified under oath, as the court's order records, "that she spoke to a therapist for Mr. Dow who indicated that he had a diagnosis of Schizophrenia and was off his medications." (Ex. F.) That statement was false in every particular that mattered: Plaintiff had no therapist; no provider had rendered a schizophrenia diagnosis; and his actual provider's letter, before the same court the same day, said he was in regular follow-up, medicated as prescribed, "stable and doing well." (Ex. F.) The statement was material within the meaning New Hampshire law gives that word, "capable of affecting the course or outcome of the proceeding": the court recited it among its findings and shaped its orders around Plaintiff's mental condition. It was never retracted. Burton's own narrative shows her actual source was a family member's hearsay ("Stated that Dexter was prescribed medication by his therapist Abby"), filtered through her department's own November 5 mislabel. (Ex. C at 2, E.) Whether Burton believed her sworn statement is a question her own records answer poorly; the criminal dimension of that testimony is addressed by separate referral, and this civil action rests on her records and out-of-court publications, with the testimony pleaded as evidence of falsity, knowledge, and malice.

38. The April 2 order directed NPD to file, within ten days, a memorandum "stating the legal authority for seizure of the firearms," and to run a record check on Plaintiff for disqualifiers, with a copy to Plaintiff. (Ex. F at 2.) On April 30, the court found on the record that NPD had filed no memorandum, produced no record check, and did not attend. (Ex. G.) By pleading dated May 11, 2024, NPD withdrew its objection; that pleading has never been provided to Plaintiff. On June 24, 2024, the court recorded counsel's representation that background checks on Plaintiff "did not find any disqualifiers," granted the motion, and ordered the weapons returned. (Ex. H.) They were thereafter returned to Plaintiff.

**F. August 2024: the denial, and the conviction that does not exist**

39. On or about August 8, 2024, Plaintiff applied to purchase a handgun from a federal firearms licensee and was denied. On August 31, 2024, the Division of State Police issued an Order of Denial signed by Lt. Bonilla for Colonel Hall, stating that "a routine background investigation ... revealed that your criminal record has the following conviction(s) that meet(s) federal disqualifier(s)" and listing one: offense date "08/08/2024," charge "C - FEDERAL," court "FBI NICS," state "NH," docket "2703011194," disqualifier "922(g)(3) CONTROLLED SUBSTANCE ILLEGAL USER/ADDICT." (Ex. A.) The "offense date" is the application date; the "court" is a database; the "docket" is a transaction number; the "conviction" is nothing at all. The State's own considered position, litigated and stated to a court sixty-eight days earlier, was that Plaintiff had no disqualifiers. (Ex. H.)

40. On August 17, 2026, the FBI CJIS Division's NICS Section responded to Plaintiff's FOIA request in writing: the federal record concerning Plaintiff was a temporary NICS Indices entry; it was removed on November 11, 2024; and the FBI holds no information on the underlying incident. (Ex. Z.) A temporary federal entry the Bureau cannot trace to any incident nonetheless produced the August 8, 2024 denial, the August 31, 2024 Order, and a recorded disability that ran until the entry's removal — and the only record-level source for the substance-use assertion behind it is the line in Defendant Burton's own narrative.

41. Section 922(g)(3) reaches an "unlawful user of or addicted to any controlled substance." 18 U.S.C. § 922. The only arguable record-level seed for such a designation is the disputed marijuana line in NPD's November 2023 file. (Ex. B, C.) In United States v. Hemani, No. 24-1234, 608 U.S. ___ (June 18, 2026), the Supreme Court held that disarming a person on the basis of marijuana use of that character violates the Second Amendment. Slip op. at 17–19. The entry is erroneous in fact, unsupported by any conviction or adjudication, and unconstitutional as applied even on its own terms.

**G. The jeopardy the Defendants created**

42. The June 24, 2024 return order and the August 31, 2024 Order of Denial cannot both be true. If the 922(g)(3) designation were true, then from the day NPD handed the firearms back, Plaintiff's possession of them, possession restored by court order, on the State's own no-disqualifier representation, would constitute a federal felony punishable by up to fifteen years' imprisonment. 18 U.S.C. § 924(a)(8). Either the State's systems have branded an innocent man a prohibited person, or the State's officers armed a prohibited one. Both horns of that dilemma are the Defendants' making, and Plaintiff, who did nothing but obey court orders and background checks, is the one standing under it.

43. The jeopardy is not abstract. Plaintiff possesses the returned firearms in reliance on a court order and the State's representation, while a live federal index entry asserts he may not. He cannot purchase; he cannot know whether a traffic stop, a records check, or a vindictive

tip converts his compliance into an indictment; and the entities that created the contradiction have refused for two years to resolve it. A declaration of his status and correction of the record are the only exits, and only this Court can compel them.

**H. 2025–2026: three towns' files expose Northfield's concealment, and Northfield's story collapses in writing**

44. Beginning in 2025–2026 Plaintiff served written requests under RSA 91-A on Northfield, Meredith, Franklin, and state agencies, and a case-record request on DCYF under RSA 170-G:8-a. Meredith produced thirteen dispatch logs and two reports on July 7, 2026, while asserting a "Privacy Balancing Test" and a purported right "to obtain a clearly defined purpose for any and all requests," a condition the statute nowhere permits, and on July 27, 2026, mid-dispute and two days after Plaintiff's litigation hold, issued a new blanket redaction policy. (Ex. O.) Franklin produced its call histories the same week. (Ex. M.)

45. Northfield's production, printed June 11, 2026, bears the stamp "** Portions of this report have been redacted **" with no statutory exemption identified for any redaction. (Ex. P.) As of the Town's July 28, 2026 declaration that its production was complete, Northfield had not produced: (a) the May 11, 2024 withdrawal pleading, recited in a court order; (b) the background-check records its counsel described in open court; (c) any record of the provider communication Burton swore to; (d) its side of the February 28, 2024 Meredith exchange, including whatever arrived at ABURTON@northfieldnh.gov; (e) its DCYF communications, including the report Burton's narrative admits making ("[I call]ed DCYF to make a report") and the safety-plan call its own report records; and (f) the Northfield communications concerning Plaintiff, spanning November 8, 2023 through October 8, 2025, that appear in Franklin's production, at least six of which Plaintiff itemized in writing. (Ex. J, K, M, N.) Records that exist in three towns' files cannot be nonexistent in the town that generated them.

46. On July 28, 2026 at 2:47 p.m., the Town wrote that NPD "has provided all records responsive to your request," that the request was "fully satisfied," and that "this matter [is] now closed." Plaintiff served an itemized deficiency the same afternoon, invoking RSA 91-A:4, IV's item-by-item requirement. On July 29, 2026, the Town reversed itself: "We are still reviewing and researching your request and expect to have a response to you by August 7, 2026." (Ex. N.) The Town's second email is an admission that its first was false when made. The Town acknowledged the July 25, 2026 litigation hold; those preservation obligations are in effect.

47. The concealment is now documentary rather than inferential. The February 29, 2024 transmission and Sgt. Burton's reply exist; the counterparty agency produced them on August 6, 2026; Northfield's productions, through the Town's July 28, 2026 declaration that the request was "fully satisfied" and "closed," contain neither. (Ex. N, W.)

48. The Town's self-selected August 7, 2026 date passed with no production, no denial, and no communication of any kind. On August 21, 2026, Plaintiff served a written final demand on Interim Chief Lewandoski and the Town Administrator. On August 27, 2026 the Town acknowledged receipt of Plaintiff's storage drive and stated that it would begin loading the Department's policies to it. On September 16, 2026 the Town wrote that the requested information had been loaded to the drive and was ready to be picked up at Town Hall. Plaintiff has not yet retrieved or reviewed that production and makes no allegation here about its contents. On August 24, 2026 the Meredith Police Department served a per-redaction exemption index on a materially identical request, the written statement RSA 91-A:4, IV(c) requires. As of the Town's September 16, 2026 notice, the Town had served no such statement for the redactions in its June 2026 production.

**I. Records integrity: alterations and post-hoc modifications in the files at issue**

49. The produced files bear modification stamps postdating the recorded events, several clustered around the moments that matter. Meredith's 23-368-OF narrative shows "Modified: 12/08/2023," one month after the events and after Burton's November 11 escalation; Meredith attributes this to an administrative filing save, and Plaintiff records that explanation while noting the audit trail has not been produced. Franklin's file for the August 28, 2024 FBI Electronic Tip Center call, three days before the Order of Denial, shows entries modified August 29, 2024 with privacy notations and again October 9, 2024; a 2019 record shows the same October 9, 2024 modification hand. (Ex. S, T.) Whether these are innocuous redaction processing or something else is precisely what audit trails answer; Plaintiff has demanded them, and their continued absence from any production is itself part of the pattern pleaded here. Government records concerning Plaintiff have been altered after the fact, by multiple hands, in windows adjacent to litigation and to the federal denial, and no agency has produced the change history the systems automatically keep.

**J. The third-party accusation pipeline into federal systems**

50. The record documents a pipeline by which unverified accusations about Plaintiff reached federal systems: repeated FBI tip-line reports attributed to a family member relayed to Burton on November 11, 2023 (Ex. C at 1); an FBI Electronic Tip Center 911 relay to Franklin on August 28, 2024, three days before the denial issued (Ex. S); and preserved third-party messages urging that D.D. be "save[d]" from her "drug addicted father." The same pipeline that produced two years of debunked accusations (Section A) feeds the same federal ecosystem that produced reference 2703011194. Whether a tip, the NPD notation, or both seeded the entry is a fact uniquely in the Defendants' and the FBI's possession; Plaintiff's 28 C.F.R. § 25.10 requests demand exactly that answer.

51. Under 28 C.F.R. § 25.10, Plaintiff is entitled to the reason for the denial within five business days of a written request, and to seek correction; Plaintiff requested the records

underlying the denial from the New Hampshire Department of Safety on July 30, 2026; the Department has declined to produce the records sought in five of the six items of that request, citing RSA 159-D:2, and has stated that it will complete its response to the sixth by December 16, 2026. On information and belief, the Order of Denial of August 31, 2024 has not been corrected or rescinded.

**K. Injury**

52. Plaintiff suffered and continues to suffer: loss of possession and use of his firearms from November 11, 2023 until return in 2024; the legal disability on acquisition from the August 8, 2024 denial until at least the November 11, 2024 removal of the federal entry, the uncorrected Order of Denial thereafter, and the jeopardy described in Section G; reputational injury from official records denominating him mentally ill, schizophrenic, and a convicted drug user/addict, none supported by any diagnosis, adjudication, or conviction, injuries per se to a working journalist; dissemination of his private medical information across agencies and into federal systems; the burden and expense of eighteen months of litigation and records work forced by the Defendants' concealment; out-of-pocket losses including the denied purchase; humiliation, anxiety, sleeplessness, and emotional distress with physical manifestations; and the corrosion of the ordinary security of a person who now cannot trust what his government's files say about him.

53. Defendants did not injure a blank slate, and their own files prove they knew it. Those files identify Plaintiff as the protected party in a domestic violence order; the target of a documented, years-long pattern of false accusations, including an impersonation of DCYF aimed at his daughter's daycare; a father who buried the child's mother; a man whose accusers' claims the investigating agencies themselves discredited. (Ex. P, Q, R.) To be disarmed while asking for help, psychiatrically labeled by a stranger, reported to child protection, and federally branded a convicted addict did not inflict a first wound; it reopened every prior one. The foreseeability of severe distress to this plaintiff is written in the Defendants' own records, and the injury includes the retraumatization of a grieving father who had survived years of false allegations only to receive the same treatment from the government itself. As a survivor of Megan Robinson's crimes and false allegations, documented in the Defendants' own files, Plaintiff experienced their conduct as that abuse continued by more powerful hands: manipulative in method, retraumatizing in effect, and unforgivable in both. The law's name for the resulting harm is severe emotional distress, and it is pleaded with its physical accompaniments in Count XV.

**COUNT I**

**42 U.S.C. § 1983: Fourth Amendment, Unreasonable Seizure and Retention of Property (against**

Burton, Smith, and the Town)

54. Plaintiff incorporates all preceding paragraphs.

55. The Fourth Amendment protects property as well as persons; a seizure occurs upon any meaningful interference with possessory interests. Soldal v. Cook County, 506 U.S. 56 (1992). The warrantless taking and seven-month retention of Plaintiff's firearms, during a voluntary station visit, in an incident NPD classified "No Crime Involved," fits no exception: no warrant, no exigency, no valid consent to retention, no incident to arrest, and no community-caretaking license, which does not exist as a freestanding warrant substitute. Caniglia v. Strom, 593 U.S. 194 (2021). A hand-over for momentary safekeeping is not consent to confiscation, as Meredith's officers twice demonstrated that same week by taking and returning the same pistol. (Ex. K, L.)

56. Retention was independently unreasonable: Burton announced conditions, a psychological evaluation and a court motion, that no law authorizes; the Department, twice ordered, could cite no authority; and it kept the property months after conceding no disqualifiers existed. Each Defendant participated personally: Burton seized and set the conditions; Smith participated in the taking and memorialized the department's position; the Town's liability is pleaded in Count VIII's terms and Count VII below.

**COUNT II**

**42 U.S.C. § 1983: Second and Fourteenth Amendments, Deprivation of the Right to Keep and Bear**

Arms (against Burton and the Town; official-capacity relief against Quinn, Hall, Bonilla)

57. Plaintiff incorporates all preceding paragraphs.

58. The Second Amendment secures Plaintiff's right to keep and bear operable arms. District of Columbia v. Heller, 554 U.S. 570 (2008); N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1 (2022). The deprivation ran, in two phases: physical disarmament from November 2023 into 2024 without lawful authority; and the continuing bar on acquisition maintained through the false 922(g)(3) record the State Defendants issued and enforce. No historical tradition supports disarming a citizen on an officer's say-so pending an evaluation she may not lawfully require, and Hemani forecloses the marijuana rationale on which the federal entry rests. (Slip op. at 17–18.) The Court reserved only prosecutions supported by individualized proof of dangerousness, slip op. at 18–19; this record contains the opposite: a contemporaneous law-enforcement finding of no danger. (Ex. K.) The deprivation is ongoing and warrants damages against the individual and municipal Defendants and prospective correction against the State Defendants. The federal component of the second phase ran from the August 8, 2024 denial until the NICS Indices entry's removal on November 11, 2024; the uncorrected state Order of Denial and its file persist. (Ex. A, Z.)

**COUNT III**

**42 U.S.C. § 1983: Fourteenth Amendment, Procedural Due Process (against Burton, Colby, and the**

Town; official-capacity relief against Quinn, Hall, Bonilla)

59. Plaintiff incorporates all preceding paragraphs.

60. Plaintiff held protected property interests in his firearms and protected liberty interests in acquiring arms and in his good name coupled with legal status. The process due before and after such deprivations is measured by Mathews v. Eldridge, 424 U.S. 319 (1976), and property may not be taken even temporarily without notice and hearing appropriate to the occasion, Fuentes v. Shevin, 407 U.S. 67 (1972). Defendants supplied none of it: no pre-deprivation process; a post-deprivation "process" consisting of extra-legal conditions announced in a log; months of forced litigation met with defiance of the court's own process-supplying orders; and a federal disqualification issued without notice, hearing, or any reliable safeguard, misdescribing a database ping as a criminal conviction. The procedures available were constitutionally inadequate at every stage, and remain so while the entry stands.

## COUNT IV

## 42 U.S.C. § 1983: Fourteenth Amendment, Fabrication and Knowing Use of False Records (against

Burton; against Fitzherbert and Smith as to record entries, to the extent discovery shows knowledge)

61. Plaintiff incorporates all preceding paragraphs.

62. Due process is violated when state actors create or knowingly use false information in official records to work a deprivation of liberty or property. The false entries here are specific, documented, and consequential: the "THERAPIST" designation (Ex. E); the schizophrenia-diagnosis claim attributed to a nonexistent therapist (Ex. F), contradicted by the provider's own letter and by Burton's own narrative identifying her source as family hearsay (Ex. C at 2); the disputed "marijuana user" entry that is the only conceivable seed of the federal flag (Ex. B, C); the report to DCYF asserting "psychotic episodes" in two people and danger to a child, made about a man Burton wrote she had "never met" (Ex. V); the record entries associating Plaintiff as the caller of police and FBI contacts he never initiated (Ex. L.3, M); and the "seized for severe mental health issues" rationale with invented return conditions (Ex. B). These records were used, in the objection, at the hearing, and in the inter-agency and federal pipeline, to prolong the seizure and to generate the disqualifying entry. Liability rests on the creation, maintenance, dissemination, and non-testimonial use of the records; sworn testimony is evidence of falsity and intent, not the basis of the claim. Briscoe v. LaHue, 460 U.S. 325 (1983), is respected and inapposite.

63. To the extent any Defendant claims child-protection reporting immunity under RSA 169-C:31, the statute protects only good-faith participation. Burton escalated to DCYF and multi-town child checks after learning of two no-danger findings, while leveraging the

firearm, and the child-check she ordered found D.D. "happy and in good health" hours before the seizure. A child-protection report founded on psychiatric conclusions about a man the reporter admitted in writing she had never met, contradicted the same evening by the child-welfare check she herself ordered, presents the good-faith question in its purest form. Good faith is, at minimum, a jury question. See Marquay v. Eno, 139 N.H. 708 (1995) (no direct statutory claim pleaded).

**COUNT V**

**42 U.S.C. § 1983: Fourteenth Amendment, Stigma-Plus (against Burton; official-capacity relief**

against Quinn, Hall, Bonilla)

64. Plaintiff incorporates all preceding paragraphs.

65. Where the State attaches a stigmatizing label and alters a right or legal status, due process demands notice and a hearing. Wisconsin v. Constantineau, 400 U.S. 433 (1971) (posting as "excessive drinker" without hearing unconstitutional); Paul v. Davis, 424 U.S. 693 (1976). Defendants' records brand Plaintiff schizophrenic, a sufferer of "severe mental health issues," and a convicted "controlled substance illegal user/addict." The "plus" is concrete and continuing: the seizure and retention, the transfer denial, and the standing legal disability. Constantineau's posted drinker lost the right to buy liquor; Plaintiff lost, and still loses, the right to buy arms, on a label with less process than the posting had, none. No name-clearing process has been offered despite demand. Damages lie against Burton; correction and expungement against the State Defendants.

**COUNT VI**

**42 U.S.C. § 1983: Fourteenth Amendment, Informational Privacy (against Burton)**

66. Plaintiff incorporates all preceding paragraphs.

67. The Constitution protects an individual interest in avoiding disclosure of personal matters, including medical information. Whalen v. Roe, 429 U.S. 589 (1977). Burton solicited Plaintiff's mental-health-flagged records by informal email outside any legal process, for litigation advantage (Ex. J), and disseminated medical characterizations of Plaintiff to DCYF, to sister agencies, and into channels feeding federal systems. The gathering and spreading served no legitimate custodial or investigative function, the incident being closed and crimeless, and would be highly offensive to any reasonable person.

**COUNT VII**

**42 U.S.C. § 1983: Conspiracy to Deprive Constitutional Rights (against Burton, Smith, Fitzherbert,**

and Paulhus, individually)

68. Plaintiff incorporates all preceding paragraphs.

69. From November 5, 2023 forward, the individual Defendants reached an understanding, express or tacit, to accomplish through their combined record-making what none could do lawfully alone: Paulhus took and relayed; Fitzherbert created the "therapist" frame; Smith memorialized the safekeeping fiction and the drug line; Burton seized, set conditions, escalated to other towns and DCYF, gathered records ex parte, and swore to the composite. The overt acts are the entries and communications pleaded above, each in furtherance of the shared object of retaining Plaintiff's firearm and justifying it after the fact. The agreement is a fact question; the coordination is already documentary. Pleaded in the alternative to individual liability, and against the officers in their personal capacities.

**COUNT VIII**

**42 U.S.C. § 1983: Municipal Liability (against the Town of Northfield (Monell))**

70. Plaintiff incorporates all preceding paragraphs.

71. Monell v. Department of Social Services, 436 U.S. 658 (1978). Each element is pleaded to the record; where the record is incomplete, the gap is stated.

72. Policymaker. A single decision by an official with final policymaking authority binds the municipality. Pembaur v. City of Cincinnati, 475 U.S. 469 (1986); City of St. Louis v. Praprotnik, 485 U.S. 112 (1988). Chief Colby was the Town's final law enforcement policymaker; he personally approved report 23-238-OF, which on its face documents a warrantless, no-crime seizure with extra-legal return conditions (Ex. D), and he commanded the Department through its court-order defiance (Ex. G). Formal charter designation, if disputed, is a discovery matter; the approval and command are of record now.

73. Policy, custom, ratification. The operative custom is written in the Town's own documents: seizure "for safe keeping" without authority (Ex. B); announced evaluation-and-motion conditions (Ex. B); institutional refusal to identify authority when twice ordered (Ex. G); the Chief's approval (Ex. D); and the 2026 closure-then-reversal on production (Ex. N). Ratification by the final policymaker of the act and its basis independently suffices. Plaintiff states the hole plainly: he does not yet possess proof of similar seizures from others; whether the custom has other victims is a discovery subject, and the Town's inability to cite authority for this one is itself evidence no lawful policy existed.

74. Deliberate indifference and causation. Failure to train and supervise on seizure, retention, return, recordkeeping, and medical-information handling is actionable where the need is obvious and the failure causes the violation. City of Canton v. Harris, 489 U.S. 378 (1989). Officers who announce unlawful conditions, a chief who approves them, and a department that cannot name its authority under court order together evidence exactly that failure; the predictable result, prolonged deprivation and a poisoned federal record,

occurred. The Town enjoys no qualified immunity. Owen v. City of Independence, 445 U.S. 622 (1980).

**COUNT IX**

**18 U.S.C. § 925A: Erroneous Denial of Firearm Transfer (against Quinn, Hall, and Bonilla in**

official capacity, and the United States)

75. Plaintiff incorporates all preceding paragraphs.

76. Under 18 U.S.C. § 925A, a person denied a transfer due to erroneous information provided by a State or the national system may sue the responsible entity or the United States for correction of the information and approval of the transfer, with attorney's fees in the court's discretion. Plaintiff was denied on or about August 8, 2024 solely on NICS reference 2703011194, coded 922(g)(3), which the Order of Denial itself misdescribes as a criminal conviction with an offense date equal to the application date. (Ex. A.) Plaintiff is not an unlawful user of or addicted to any controlled substance, has no qualifying conviction, and could not constitutionally be disabled on the asserted basis in any event. Plaintiff seeks an order directing correction and expungement of the erroneous entry in the NICS indices and New Hampshire's records, removal of the false conviction designation, approval of the denied transfer, and fees and costs.

**COUNT X**

**Declaratory Judgment, 28 U.S.C. §§ 2201–2202 (against Quinn, Hall, Bonilla in official capacity,**

and the United States)

77. Plaintiff incorporates all preceding paragraphs.

78. An actual, concrete controversy exists: the State's officers restored firearms to Plaintiff under court order upon a no-disqualifier representation, while the State's and the national system's records simultaneously designate him a prohibited person, exposing his court-ordered possession to felony jeopardy under 18 U.S.C. §§ 922(g)(3) and 924(a)(8). Plaintiff seeks a declaration that he is not, and was not on August 8, 2024, an unlawful user of or addicted to any controlled substance within § 922(g)(3); that NICS reference 2703011194 is erroneous and describes no conviction; that his possession and acquisition of firearms are not disqualified thereby; and such further relief under § 2202 as effectuates the judgment, including transmission of the correction to every index in which the entry appears.

**COUNT XI**

**Defamation (against Burton, individually (New Hampshire common law))**

79. Plaintiff incorporates all preceding paragraphs.

80. Burton published to third parties, Meredith and Franklin personnel, DCYF, and record systems foreseeably feeding state and federal databases, false factual statements: that Plaintiff suffers "severe mental health issues," that a "therapist" had diagnosed schizophrenia, that he is a drug user, that he repeatedly called the FBI hotline, and, to DCYF, that he and his mother were "having psychotic episodes" and that "he would do something to" his daughter, characterizations she coupled with the written admission "although I have never met him" (Ex. V). Each was false; each was made negligently or with knowledge or reckless disregard of falsity, her own files supplying the contrary facts; and each is defamatory per se, imputing loathsome mental disease and criminal-adjacent conduct injurious to Plaintiff's profession. The claim rests on out-of-court publications; testimony is evidence, not the publication sued upon. Timely under RSA 508:4, II.

**COUNT XII**

**Invasion of Privacy (against Burton, individually (New Hampshire common law))**

81. Plaintiff incorporates all preceding paragraphs.

82. New Hampshire recognizes liability for intrusion upon seclusion, Hamberger v. Eastman, 106 N.H. 107 (1964), and for publicity given to private facts. Burton intruded into Plaintiff's private medical sphere by gathering mental-health-flagged records through informal ex parte solicitation (Ex. J), and gave publicity to private health information across agencies with no need to know. The conduct would be highly offensive to a reasonable person and served no legitimate public concern.

**COUNT XIII**

**Conversion (against Burton individually and the Town)**

83. Plaintiff incorporates all preceding paragraphs.

84. Defendants intentionally exercised dominion and control over Plaintiff's firearm(s), seriously interfering with his right of possession, from November 11, 2023 until return in 2024. Plaintiff demanded return the night of the taking and repeatedly thereafter; Defendants refused, conditioning return on requirements the law does not impose, and yielded only to court order. Plaintiff is entitled to damages for the deprivation, including loss of use and the expenses of recovery. Pleaded subject to, and to the extent permitted by, RSA ch. 507-B as to the Town.

**COUNT XIV**

**Negligence; Negligent Training and Supervision (against the Town and Colby)**

85. Plaintiff incorporates all preceding paragraphs.

86. The Town and Chief Colby owed Plaintiff reasonable care in training and supervising officers on seizure, retention, return of property, truthful recordkeeping, and handling of medical information, and in ensuring compliance with court orders directed to the

Department. The breaches are the events pleaded; causation is direct; damages follow. Pleaded subject to, and to the extent permitted by, RSA ch. 507-B; the constitutional and intentional counts stand independently.

**COUNT XV**

**Negligent Infliction of Emotional Distress (against Burton and the Town)**

87. Plaintiff incorporates all preceding paragraphs.

88. Defendants owed Plaintiff a duty of reasonable care in the conduct pleaded above, breached it, and thereby caused him serious emotional distress that a reasonable person, and foreseeably this plaintiff, could not be expected to withstand: disarmed when he came to the police for help; converted in official records into a schizophrenic, a psychotic, and a drug criminal; reported to child protection as a danger to the daughter he was trying to find; and left for two years inside a government-built contradiction that makes his court-ordered possession a potential federal felony. The distress was accompanied by physical manifestations, including sleeplessness and anxiety, with particulars to be established through discovery and proof. Foreseeability is not hypothetical: the Defendants' own files documented Plaintiff's history as a protected victim of sustained false accusations and as a grieving parent, and injuring such a person in exactly the ways his history made him vulnerable is the definition of foreseeable harm.

**COUNT XVI**

**New Hampshire Constitution, Part I, Articles 2-a, 15, and 19: Declaratory Relief (against all**

Defendants except the United States (RSA 491:22))

89. Plaintiff incorporates all preceding paragraphs.

90. The seizure and retention without warrant or authority, the deprivation of arms without due process of law, and the fabricated records violated Plaintiff's rights under the New Hampshire Constitution, Part I, Article 2-a (right to keep and bear arms), Article 15 (due process), and Article 19 (searches and seizures). Plaintiff seeks a declaration to that effect under RSA 491:22, with any further remedy New Hampshire law affords.

**COUNT XVII**

**Violation of RSA 91-A (Right-to-Know Law) (against the Town of Northfield (supplemental))**

91. Plaintiff incorporates all preceding paragraphs.

92. The Town violated RSA 91-A:4 by producing pages stamped redacted with no exemption cited (Ex. P); withholding the May 11, 2024 pleading and the background-check records recited in court orders; producing no record of communications documented in three sister agencies' files (Ex. J, K, M); and declaring the request "fully satisfied" and "closed"

before conceding review was ongoing (Ex. N). Plaintiff seeks declaratory relief, an order to produce or to justify item by item, and costs and reasonable attorney's fees under RSA 91-A:8. A parallel petition under RSA 91-A:7 is prepared for the Superior Court should this Court decline this Count.

## COUNT XVIII

### Declaratory Judgment, RSA 491:22 (against the Town of Northfield; Quinn, Hall, and Bonilla in

official capacity) (supplemental)

93. Plaintiff incorporates all preceding paragraphs.

94. Under RSA 491:22 and this Court's supplemental jurisdiction, 28 U.S.C. § 1367, Plaintiff seeks a declaratory judgment of his rights and status under New Hampshire law: that the November 11, 2023 taking and subsequent retention of his firearm were without warrant, statutory authority, or other legal basis under the law of New Hampshire; that no New Hampshire statute conditioned return of the property on a psychological evaluation or a court motion; and that no record of any New Hampshire agency lawfully designates Plaintiff a person prohibited from acquiring or possessing firearms. The declaration sought mirrors, under state law, the federal declaration sought in Count X, and the same actual controversy supports it.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

1. Enter judgment for Plaintiff on all Counts;

2. Award compensatory damages against Burton, Smith, Fitzherbert, Paulhus, Colby, and the Town, jointly and severally as the law permits, in an amount the jury determines, including for the deprivation period, the continuing acquisition bar, reputational and emotional harm, and consequential losses;

3. Award punitive damages against the individual-capacity Defendants for reckless and callous indifference to Plaintiff's federally protected rights;

4. Declare, under 28 U.S.C. §§ 2201–2202, that Plaintiff is not and was not an unlawful user of or addicted to any controlled substance within 18 U.S.C. § 922(g)(3); that NICS reference 2703011194 is erroneous and reflects no conviction; and that Plaintiff's possession and acquisition of firearms are not disqualified thereby;

5. Order Defendants Quinn, Hall, and Bonilla, and the United States as to the federal indices, to correct and expunge the erroneous entry, remove the false conviction designation, transmit the correction to every system in which it appears, and approve the denied transfer, under 18 U.S.C. § 925A;

6. Order the Town to produce the withheld records or serve an item-by-item written denial citing a specific exemption for each item and each redaction, and declare the Town's conduct in violation of RSA 91-A;

7. Declare, under RSA 491:22, that the November 11, 2023 seizure and the subsequent retention of Plaintiff's firearm were without legal authority under New Hampshire law;

8. Order correction of NPD records to remove the designation of Abigail Olden, APRN, as Plaintiff's "therapist," and every notation characterizing Plaintiff as a drug user or as diagnosed with schizophrenia, or to append Plaintiff's statement of dispute to each, with the correction disseminated to every agency that received the original;

9. Declare, under RSA 491:22, the violations of the New Hampshire Constitution pleaded in Count XVI;

10. Award reasonable attorney's fees and costs under 42 U.S.C. § 1988, 18 U.S.C. § 925A, and RSA 91-A:8, and such costs as a pro se litigant may recover;

11. Award pre- and post-judgment interest; and

12. Grant such other and further relief as is just.

## JURY DEMAND

Plaintiff demands trial by jury on all Counts and issues so triable.

Respectfully submitted,

Dexter William Dow, pro se
92 Sanborn Street, Franklin, NH 03235 • (603) 707-0276 • dexterdow33@gmail.com
Dated: November 16, 2026

## EXHIBIT INDEX (A–Z)

Exhibits A through W are compiled, with source citations and enlarged details, in the Evidence Exhibit File (69 pp.). Exhibits X through Z are in the Addendum to that file. A: Order of Denial, 8/31/24. B: NPD CFS log 11/11–12/23 (Smith; Burton seizure entry). C: Burton narrative 23-238-OF (3 pp.). D: NPD incident header (No Crime Involved; Colby). E: NPD CFS 11/5/23 (THERAPIST OLDEN, ABBY; Paulhus relay). F: Order 4/2/24 (2 pp.). G: Order 4/30/24. H: Order 6/24/24. I: State's Objection 2/26/24. J: Meredith CFS 24-1996 (Burton solicitation). K: Meredith 23-368-OF (Call 23-10332; Officer Gilcoine; approved Lt. McLaughlin; DCYF intake

1050008). L: Meredith CFS 23-10228 and 23-10416. M: Franklin CFS 23-28085. N: Northfield closed / still-reviewing emails 7/28–30/26. O: Meredith letters 7/7, 7/29/26; Redaction Notice 7/27/26. P: NPD redaction-stamp page 19-88-OF. Q: Meredith 21-220-OF (2021 accusation debunked; Northfield-referral gap). R: Franklin 2019 file (Plaintiff as protected victim; DCYF impersonation call). S: Franklin call 24-21540 (FBI Electronic Tip Center, 8/28/24; privacy-notation modifications). T: Post-hoc modification stamps (Meredith 12/8/23; Franklin 10/9/24). U: Provider message record, Nov. 5–6, 2023 (single overnight message; no threats; provider reply 5:22 a.m.). V: Burton narrative detail, the DCYF report passage ("although I have never met him"; "he would do something to her"). W: Meredith production, Aug. 6, 2026: Chief Harper letter; the McLaughlin-to-Burton transmission of Feb. 29, 2024, 6:39 a.m., with Burton's 11:28 a.m. reply; Call 15-1214 (Feb. 10, 2015); and the contact check sheet as re-released. X: the nine-page Meredith packet, print-dated 2/28–29/24, released 8/17/26 (caution header; 2006 entries unmarked for annulment; Call 15-1214; 23-368-OF unredacted). Y: Meredith correspondence 8/18–24/26 (the IV(b) letter; the 21-220-OF case audit log; the per-redaction exemption index). Z: FBI CJIS NICS Section FOIA response, 8/17/26 (temporary NICS Indices entry; removed 11/11/24).